# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| NORTHWESTERN SELECTA, INC.<br><br>      Plaintiff,<br><br>v.<br><br>SECRETARY OF THE DEPARTMENT OF AGRICULTURE OF PUERTO RICO, Ramón González Beiró, and DEPUTY SECRETARY OF THE DEPARTMENT OF AGRICULTURE OF PUERTO RICO, Alex Muñiz Lasalle,<br><br>      Defendants. | Case No. 22-01092 (RAM)<br><br><br><br>Complaint for Declaratory Judgment and Preliminary and Permanent Injunction |

## OFFICIAL CAPACITY DEFENDANTS' BRIEF

**TO THE HONORABLE COURT:**

**NOW COME** Official Capacity Defendants, the Secretary of the Puerto Rico Department of Agriculture, and the Deputy Secretary of Puerto Rico Department of Agriculture, by and through the undersigned attorney to submit their brief in response and opposition to Plaintiff's brief in support of the requested injunction pursuant to Docket 14, paragraph 6(b):

## I.
## INTRODUCTION AND SUMMARY OF BRIEF

The Official Capacity Defendants ask the Court to deny Plaintiff's request to permanently enjoin them from enforcing certain local regulations related to poultry products. Defendants assert that the PPIA does not preempt Regulation 8's dispositions related to the presence of an inspector upon opening of a shipping container, nor the

requirement to label either "keep frozen" or "keep refrigerated." These requirements are either not within the scope of the PPIA's pre-emption statute, or are not "in addition to" or "different than" the dispositions of the PPIA. Moreover, there are certainly no commerce clause implications to the foregoing requirements[1]. Alternatively, the Court should abstain from issuing a judgment in the matters set forth in the complaint until after Plaintiff's administrative claims are finally adjudicated by the Department of Agriculture – claims which are identical to those raised here.

## II.
## OPERATIVE FACTS RELATED TO
## THE REQUEST FOR AN INJUNCTION

The following are the operative facts related to Northwestern Selecta, Inc. ("NWS") request for an injunction on its pre-emption claim. These facts are stipulated:

1. The [NWS] facilities located at 769 Calle C, Mario Juliá Industrial Park, San Juan, Puerto Rico 00920 are certified as an "official establishment" by the United States Department of Agriculture.

2. NWS imports fresh and frozen poultry products domestically from within the United States, as well as frozen poultry products from foreign countries.

3. Most NWS shipping containers containing poultry products also contain other food products.

4. All importers, including NWS, provide copies of bills of ladings and informs the Puerto Rico Department of Agriculture ("PRDA") of the contents of the cargo shipping containers that arrive to the Port of San Juan. The bills of lading do not inform the PRDA of product conditions upon arrival. Only a visual inspection of the product shows the product condition upon arrival. All poultry products that NWS imports from within the U.S. have already been inspected and passed on the mainland by the U.S. Department of Agriculture ("USDA") and bear an official mark to that effect.

---

[1] Plaintiff has left this claim out of its brief hoping to keep its powder dry in order to fight another day. Defendants will do the same.

5.　　PRDA detained fresh poultry products from within the US by NWS bearing the label "Keep Refrigerated or Frozen" and did not allow NWS to distribute the products in Puerto Rico unless they were re-labeled with a label that reads "Keep Refrigerated" or "Keep Frozen."

6.　　On December 7, 2021, the PRDA Deputy Secretary, through its inspectors, issued several Orders of Detention impounding over 7,000 pounds of fresh poultry products at the NWS facilities which had been imported from within the U.S. by NWS. The grounds for the Order of Detention were that the products were labeled as "Keep Refrigerated or Frozen" in violation of Article XIV(A)(6) of Regulation 8.

7.　　On June 30, 2021, the PRDA Deputy Secretary, through its inspectors, also issued several Orders of Detention, impounding over two hundred thousand (200,000) pounds of fresh poultry products imported by NWS from within the United States. The grounds for the Orders of Detention were that a PRDA inspector was not physically present when the shipping container containing the products was opened and unloaded at the NWS facilities, asserting a violation of Article XII(B) of Regulation 8.

8.　　Since June 2021 and through the day of this stipulation, the PRDA Deputy Secretary has: (a) issued Notices of Violation against NWS with respect to thirty-five (35) shipping containers containing poultry products imported from within the U.S. that have been opened and unloaded at the NWS Facilities without the presence of a PRDA inspector, and (b) asserted the right to impose fines of approximately $263,000 against NWS.

9.　　The Deputy Secretary refused to rescind the Notices of Violation and continues to assert the right not to allow NWS to open and unload shipping containers containing poultry products imported from within the U.S at the NWS facilities without the presence of a PRDA inspector.

10.　　The USDA and the Food Inspection and Safety Service ("FSIS") do not require that a USDA-FSIS inspector be present when NWS opens and unloads shipping containers containing poultry products imported from within the U.S at the NWS facilities.

11.　　Prior to June 2021, PRDA had not enforced nor sought to enforce Article XII(B) of Regulation 8 against NWS.

12.　　On June 30, 2021, Agronomist Jaime Traverso visited the NWS facilities located in San Juan, Puerto Rico. At the moment of the visit, the containers subject to inspection had been opened and its contents unloaded. The PRDA issued Detention Orders 10395, 10396, 10397, 10398, 10399 and 10400.

13.	On June 30, 2021, Alex Muñiz, acting as Deputy Secretary for Agro-Commercial Integrity, notified NWS that it had violated Regulation 8764, and its intent to fine NWS with $500.00 fines for each violation.

14.	On July 1, 2021, the PRDA rescinded the detention orders. The detained product entered commerce.

15.	On July 20, 2021, NWS filed a motion to reconsider with the PRDA where it argued, among other grounds that Regulation 8764 was preempted by Federal Law and regulations.

16.	On August 19, 2021, the PRDA vacated without prejudice the notices of violations.

17.	On August 30, 2021, the PRDA issued a notice of violation and an order to NWS to show cause why it should not be held in violation of Regulation 8764.

18.	On September 14, 2021, NWS filed its motion showing cause where it argued, among other grounds, that Regulation 8764 was preempted by Federal Law and regulations.

19.	On October 14, 2021, the PRDA issued a resolution and order that denied the motion showing cause and imposed the fines for each violation to Regulation 8764.

20.	On November 15, 2021, NWS filed a document entitled "Petición de Reconsideración" with respect to the October 14, 2021 resolution and order, reiterating that the fines were preempted by federal law[2].

21.	On January 10, 2022, the PRDA filed its answer to the administrative complaint. In it, PRDA asserted, among other things, that the administrative forum was "not the adequate forum" to resolve NWS's claims of federal preemption[3].

22.	On January 20, 2022, the PRDA's examining officer issued an order scheduling an initial scheduling conference for February 2, 2022[4].

23.	On February 2, 2022, an initial scheduling hearing was held[5].

Dkt. #14-1.

---

[2] Exhibit 1.
[3] Exhibit 2.
[4] Exhibit 3.
[5] Exhibit 4.

### III.
### MEMORANDUM OF LAW IN
### SUPPORT OF THE OPPOSITION

A.      *NWS is not likely to succeed or has been actually successful in its pre-emption claim.*

Likelihood of success in the case of a preliminary injunction and actual success in the case of a permanent injunction is the critical fulcrum of this kind of equitable relief. *Public Service Co., v. West Newbury*, 835 F. 2d 380, 383 (1st Cir. 1987); *Lancor v. Lebannon Housing Authority*, 760 F. 2d 361, 362 (1st Cir. 1985); *Planned Parenthood League v. Bellotti*, 641 F. 2d 1006 (1st Cir. 1981). Plaintiff is not likely to succeed (or has actually succeeded) in its pre-emption claim.

1.      *The Scope of the PPIA's Preemption Section.*

Inarguably, the PPIA contains a preemption statute that provides that the "[r]equirements within the scope of this chapter with respect to premises, facilities and operations [and] [m]arking, labeling, packaging, or ingredient requirements…<u>in addition to</u>, or <u>different than</u>, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any official establishment in accordance with the requirements under this chapter…". 21 U.S.C. Sec. 467(e) (underline added). Similarly inarguable is that the District Court held that Section IV(A) of the then in vigor Regulation 8, which contained a labeling requirement, was "preempted by federal law and is in violation of the Supremacy Clause of the United States Constitution." *Northwestern Selecta, Inc., v. Muñoz,* 106 F. Supp. 223, 233 (D.P.R. 2000). The District Court explained that "[t]here [was] no doubt that Congress, pursuant to Section 467(e), intended to preempt requirements imposed by the state which

are 'in addition to' or 'different from' the 'marking' requirement established in the PPIA." *Northwestern Selecta, Inc.*, 106 F. Supp. at 229. Clearly, the statute "…added an express preemption clause to the PPIA, which states that '[m]arking, labeling, packaging, or ingredient requirements…in addition to, or different than, those under [the PPIA] may not be imposed by any State." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F. 3d 1140, 1145 (9th Cir. 2017)[6].

The PPIA"s preemption statute has congressionally established boundaries, and is limited, as relevant here, to (a) premises, facilities and operations and (b) markings, labeling, packing, or ingredient requirements that the law and regulations set forth. "Where the federal statute contains an express preemption clause, [courts] must determine the substance and scope of the clause. *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 870 F. 3d at 1146 citing *Altria Grp., Inc., v. Good*, 555 US 70, 76 (2008). *See also Rogers v. Tyson Foods, Inc.*, 308 F. 3d 785, 791 (7th Cir. 2002) (holding that the PPIA does not "completely" pre-empt state laws). In such analysis, courts assume two things: "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clean and manifest purpose of Congress" and "when the text of the pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Id*. Sometimes pre-emption may be implied when "'Congress [leaves] no room for the State to supplement it' or where the federal interest is 'so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject'." *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 870 F. 3d at 1152.

---

[6] *See also Cohen v. ConAgra Brands, Inc.*, 16 F. 4th 1283, 1287 (9th Cir. 2021) in the context of a state consumer statute.

In *Ass'n des Eleveurs de Canards et d'Oies du Quebec,* the Ninth Circuit wrestled with the issue of whether California's ban on force feeding ducks and geese to enlarge their livers needed to make *foie gras* was pre-empted by the PPIA. This case exemplifies the reasoning used to determine the scope of the PPIA's pre-emption clause. A producer of *foie-gras* and a restaurant that sold the product challenged the ban seeking injunctive relief claiming that the ban constituted the regulation of an ingredient, and thus was pre-empted by the PPIA's "in addition to/different than" "marking, labeling, packaging or ingredient" pre-emption statute. Plaintiffs also challenged the ban for the violation of the dormant Commerce Clause. The Central District of California denied the injunctive relief, which was affirmed by the Ninth Circuit. The Ninth Circuit's simple recipe was to "first determine the scope and substance of the PPIA's "ingredient requirement," by looking "to the ordinary meaning of the term." *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 870 F. 3d at 1147 citing *inter ali*a *Altria Grp., Inc., v. Good*, 555 US at 76. The Court found that the natural meaning of the term was "a physical component of a poultry product." *Id.* In its analysis, the Court concluded that the "'ingredient requirements' cannot be read to reach animal husbandry practices because the federal law '*does not regulate in any manner the handling, shipment or sale of live poultry*'." *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 870 F. 3d at 1148 (italics in original). The second step was to determine whether the state statute impinged on the parameters of the pre-emption statute. "The PPIA, which is silent on the topic of animal husbandry and feeding practices, may not be read to supplant state law on an entirely different topic." *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 870 F. 3d at 1149 citing *Cipollone v. Liggett Grp., Inc.*, 505 US 504, 517 (1992). It is completely logical that "Congress'

enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Id.* Accordingly, the Ninth Circuit held that the PPIA did not expressly pre-empt California's force-feed ban. The final step was to determine if Congress implicitly pre-empted the field. The Ninth Circuit found that the PPIA did not implicitly pre-empt California's force-feed ban, rather that "the PPIA itself contemplates extensive state involvement." *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 870 F. 3d at 1152. Such conclusion was predicated on the express pre-emption clause that provides that the "PPIA 'shall not preclude any State…from making requirement[s] or taking other action, consistent with [the PPIA] with respect to any other matters regulated under [it]'." *Id* (underline added). The PPIA "also explains that state laws regarding storage and handling are preempted *only if* the Secretary of Agriculture finds those laws to 'unduly interfere with the free flow of poultry products in commerce…'." *Id.* (Italics in original). "[S]tates may implement standards for the inspection of poultry sold in-state, even if those standards are more rigorous than the ones imposed by federal law. *Id.* (underline added), quoting *Miss. Poultry Ass'n v. Madigan*, 31 F. 3d 293, 296 (5th Cir. 1994) ("Principles of federalism . . . led Congress to choose not to displace state inspection programs. Instead, Congress in these amendments created a complex 'marbled cake' scheme . . . .") (underline added). Finally, the Ninth Circuit reminded of Supreme Court caution not to "seek out conflicts between state and federal regulation where none clearly exists." *Id.*, at 1153.

2.    *The PPIA does not Preempt Article XII of Regulation 8.*

Following the reasoning of the Ninth Circuit, Article XII and its requirement to have "[a]n official of the Department [ ] present at the time of opening and unloading of

the container" is not pre-empted by the PPIA. Dkt. #1-6, p. 27 of 37, Article XII(B). The first step is to determine the "scope and substance" of premise/facilities/operations under the PPIA and its regulation. The PPIA preempts state laws that are different than and in addition to the regulation of the premises, facilities and operations of an official establishment. 21 U.S.C. Sec. 467(e). "Each official establishment …shall have such premises, facilities and equipment, and be operated in accordance with such sanitary practices, as are required by regulation…". 21 U.S.C. Sec. 456(a). The USDA's regulations (9 CFR Part 381) regulate matters such as premises/facilities and operation. For instance, Subpart I regulates the "operating procedures" of an official establishment. 9 CFR Sections 381.65 to 381.69. These regulate the "[o]perations and procedures involving processing, other handling or storing of any poultry product…" such as slaughter practices, freezing and thawing practices, sampling frequencies, inspection rates, and line speed rates. Several sections throughout the regulation govern the equipment[7] used in poultry slaughter and preparation in official establishments and exempt establishments. Other sections govern the facilities of official establishments[8], including those for inspection and reinspection.

Clearly, Article XII(B) does not regulate anything related to NWS's premises, facilities, equipment or operations that is different or additional to the PPIA or the regulations. It merely requires that before the cargo is unloaded from within the cargo container in which it arrived to Puerto Rico into the Plaintiff's official establishment, that PRDA inspector be present. Certainly "NWS provide[s] copies of bills of lading[] and informs the [ ] PRDA of the contents of the cargo shipping containers that arrive to the

---

[7] 381.10(e)(3)(i), (ii); 381.66(c)(2)(i); 381.201
[8] Sub Part E – 381.25-.35; Sub Part G – 381.36-.39; 381.148

Port of San Juan." Dkt. #14-1 para. 4. But, such bills of lading do not inform the PRDA of product conditions upon arrival, [for which] [o]nly a visual inspection of the product shows the product conditions upon arrival." *Id*. The cargo shipping container travelled from an official establishment to the port. At the port, the cargo shipping container was set upon a cargo ship. The cargo ship set sail from a mainland port to an insular port (San Juan). Upon arrival, the shipping container is off loaded and placed on a truck and delivered to plaintiff's official establishment. Any number of things could occur in the thousand-mile trek between official establishments that could make the product unsafe for human consumption. For instance, failure of the cooling system for which the temperature of the poultry products went above the required temperature. The only way to accurately assess the condition of the product upon arrival is to have a PRDA inspector present contemporaneous to the opening the cargo shipping container, who then would take a sample of the product, verify the shipping containers and immediate containers of the product, and even assess if the products indeed have been labeled or if there is product that is not labeled. PRDA has a compelling state interest to assure that the poultry products that make the long journey arrive in a fashion that guarantees that the product is safe for human consumption. Requiring the presence of PRDA is Puerto Rico's way of assuring it.

The second step is to determine whether Puerto Rico's regulatory requirement of having an inspector present when the cargo container is opened impinges on the parameters of the pre-emption statute. The PPIA's pre-emption statute is silent about the transportation and arrival of transported poultry products to an official establishment. 21 U.S.C. 467(e). If the Congressional enactment of the "provision defining the pre-emptive

reach of a statute [then] impl[icit] [is] that matters beyond that reach are not pre-empted." *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 870 F. 3d at 1149.   If Section 467(e) is silent as to transportation and arrival, then Article XII(B) does not impinge upon Congressional pre-emption.   The closest that the pre-emption statute comes to the requirement of having an inspector present when the cargo container is opened is "storage and handling" which is only pre-empted if the Secretary of Agriculture finds that Puerto Rico's requirement "unduly interferes with the free flow of poultry products in commerce."   PRDA has not found any section in the PPIA or regulations, or even in the opinions of the USDA in this regard.   Thus, Puerto Rico's requirement does not impinge on the pre-emption statute.

The PPIA does make it unlawful to "…transport…or receive for transportation, in commerce or from an official establishment, any slaughtered poultry from which the blood, feathers, feet, head, or viscera have not been removed in accordance with regulations promulgated by the Secretary.   21 U.S.C. Sec. 458(a)(4). Indeed, "no person shall…transport…or receive for transportation in commerce or from any official establishment any slaughtered poultry for which the blood, feathers, feet, head or viscera have not been removed in accordance with the regulations"; and "no person shall…transport…or receive for transportation in commerce, any slaughtered poultry or other poultry product which is capable of use as human food and is adulterated or fails to bear an official inspection legend or is otherwise misbranded at the time of such sale, transportation…".   9 CFR 381.190(a) and (b).  Moreover, "[n]o person…, engaged in the business of buying, selling, freezing, storing, or transporting, in or for commerce, poultry products capable of use as human food…shall transport…or receive for transportation, in

commerce…any poultry product which is capable of use as human food and is not wrapped, packaged, or otherwise enclosed to prevent adulteration by airborne contaminants, unless the railroad car, truck, or other means of conveyance in which the product is contained or transported is completely enclosed with tight fitting doors or other covers for all openings." 9 CFR 381.190(c). Although the requirement to have a PRDA inspector present upon opening the cargo container is not a "transportation" act, there is literally no other way to know the conditions of the conveyance container's arrival except by having an inspector *in situs* when the cargo container is opened.

Finally, the PPIA regulations prohibit the entry into an official establishment of poultry products that are not processed in another official establishment. "No poultry product…may be brought into any official establishment unless it has been processed in the United States only in an official establishment or imported from a foreign country eligible to export such poultry and poultry products to the United States under §381.196(b), and inspected and passed, in accordance with the regulations; and unless the container of such product is marked so as to identify the product as so inspected and passed, in accordance with §381.115 or §381.205…". 9 CFR 381.145(a). Again, only the presence of an inspector upon opening the cargo container can guarantee that complying product shipped to Puerto Rico enters NWS facilities.

3.   *The PPIA does not Preempt Article XVI(A)(6) of Regulation 8.*

Puerto Rico regulations require that "[e]very container and wrapping used for the packing of poultry meat that is imported or marketed in Puerto Rico must be labeled in clear legible letters indicating, among other things…[the] [c]lass of poultry…[t]he pieces and the giblets…[n]et weight… 'keep refrigerated' if the product is fresh… 'keep frozen'

if the product is frozen…[and] [the] number of the official certificate issued for the lot…" Reg. 8765, Art. XVI(A)(1-7).  At issue here is that "[t]he term 'keep refrigerated' and 'keep frozen' cannot be used on the labeling of the same package."  Reg. 8765, Art. XVI(A)(6).  Pursuant to such, "PRDA detained fresh poultry products from within the US by NWS bearing the label 'Keep Refrigerated or Frozen' and did not allow NWS to distribute the products in Puerto Rico unless they were re-labeled with a label that reads 'Keep Refrigerated' or 'Keep Frozen'."  Dkt. 14-1, para. 5.  PRDA asks the Court to note that the poultry products did indeed enter Puerto Rico, and NWS' official establishment.  Thus the "importation" portion of the regulation is not at issue.  The only issue is whether the PPIA pre-empts in-state marketing requirements.

Again, following *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, the first step is to determine the scope and substance of the PPIA's labeling requirement by looking at its ordinary meaning.  "…[L]abeling… requirements …in addition to, or different than, those made under this Act may not be imposed by any State or Territory…".  According to the PPIA, "[a]ll poultry products inspected at any official establishment under the authority of this Act and found to be not adulterated, shall at the time they leave the establishment bear, in distinctly legible form, on their shipping containers and immediate containers as the Secretary may require, the information required under paragraph (h) of section 4[9] of this Act."  21 U.S.C. Sec. 457.  According to USDA regulations, "with respect to shipment of poultry products <u>between</u> official establishments, each shipping container[10] and each immediate container[11] of any

---

[9] 21 USCS § 453(h).
[10] "[A]ny consumer package; or any other container in which poultry products, not consumer packaged, are packed." 21 U.S.C. Sec. 453(t)

inspected and passed poultry product shall at the time it leaves the official establishment

bear a label which contains information, and has been approved, in accordance with this

subpart." 9 CFR 381.115 (underline added). As applicable to this case, this is from

official establishment X, Y or Z in one of the several States to NWS in Puerto Rico.

Subpart N governs the labeling, information and the containers for shipping poultry

product between official establishments, as well as the wording of such labeling such as

the name of product, ingredients, flavoring or coloring, additives, quantity, identification

numbers and other marks. 9 CFR Secs. 381.115 to 381.144. USDA regulations stipulate

that "[n]o statement, word, picture, design, or device which is false or misleading in any

particular or conveys any false impression or gives any false indication of origin, identity,

or quality, shall appear on any label. For example…raw poultry product whose internal

temperature has ever been below 26 °F may not bear a label declaration of 'fresh.' A raw

poultry product bearing a label declaration of 'fresh' but whose internal temperature has

ever been below 26 °F is mislabeled." 9 CFR 381.129(b)(6)(i)[12]. Conversely, "[r]aw

poultry product whose internal temperature has ever been at or below 0°F must be labeled

with the descriptive term "frozen," except when such labeling duplicates or conflicts with

the labeling requirements in § 381.125 of this subchapter." 9 CFR 381.129(b)(6)(i)[13].

---

[11] "[A]ny container used or intended for use in packaging the product packed in an immediate container."
21 U.S.C. Sec. 453(u).

[12] The rest of the section states

> The temperature of individual packages of raw poultry product within an official establishment may deviate below the 26 °F standard by 1 degree (i.e., have a temperature of 25 °F) and still be labeled "fresh." The temperature of individual packages of raw poultry product outside an official establishment may deviate below the 26 °F standard by 2 degrees (i.e., have a temperature of 24 °F) and still be labeled "fresh." The average temperature of poultry product lots of each specific product type must be 26 °F. Product described in this paragraph is not subject to the freezing procedures required in § 381.66(f)(2) of this subchapter.

[13] The rest of the section states

PRDA regulations consider fresh and frozen in the same fashion. For instance, fresh is considered to be not less than 26 °F and not more 36 °F, while frozen is considered between 0 °F and 10 °F. Reg. 8764, Art. IV(6) and (7); Art. XIV(A)(4) and (5). Thus, these terms as used in the PRDA regulation are not in addition to, nor different than the PPIA.

The second step under *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, is to decide whether the state requirement impinges on the parameters of the PPIA's labeling requirement. The regulation's "special handling label requirement" is found in Subpart N, and as such would apply to labeling of product shipped "between" official establishments. It states in relevant portions that "[p]ackaged products which require special handling to maintain their wholesome condition shall have prominently displayed on the principal display panel of the label the statement: 'Keep Refrigerated,' 'Keep Frozen,' 'Keep Refrigerated or Frozen,' 'Perishable - Keep Under Refrigeration,' or such similar statement as the Administrator may approve in specific cases. The immediate containers for products that are frozen during distribution and intended to be thawed prior to or during display for sale shall bear the statement 'Shipped/Stored and Handled Frozen for Your Protection, Keep Refrigerated or Freeze'." 9 CFR Sec. 381.125. Again, the labeling requirement under the PPIA applies to shipping between official establishments. As stipulated, a small amount of poultry was shipped between official establishments bore the "Keep Refrigerated or Keep Frozen" label. That shipment entered into Puerto Rico

---

The word "previously" may be placed next to the term "frozen" on an optional basis. The descriptive term must be prominently displayed on the principal display panel of the label. If additional labeling containing the descriptive term is affixed to the label, it must be prominently affixed to the label. The additional labeling must be so conspicuous (as compared with other words, statements, designs, or devices in the labeling) that it is likely to be read and understood by the ordinary individual under customary conditions of purchase and use. Product described in this paragraph is subject to the freezing procedures required in § 381.66(f)(2) of this subchapter.

and entered into NWS' official establishment.  However, the PRDA "did not allow NWS to distribute the products in Puerto Rico unless they were re-labeled with a label that reads 'Keep Refrigerated' or 'Keep Frozen'." That is for sale within Puerto Rico, the product had to bear a label, as permitted by the PPIA, that signals to the Puerto Rico consumer how the product should be kept – whether refrigerated or frozen.  Such a requirement does not impinge on the PPIA's pre-emption statute.

Another case out of California exemplifies labeling within the scope of the PPIA's pre-emption clause.  In *National Broiler Council v. Voss*, 44 F. 3d 740 (9th Cir. 1994), several poultry trade associations and the USDA challenged a California state statute that defined "fresh" different than from the definition in the PPIA.  Section 26661 of the California Food and Agriculture Code prohibited the processing, butchering, slaughter, packing, sale, advertisement, distribution or labeling as "fresh" all poultry with an "internal temperature [ ] below 26 degrees Fahrenheit."  Cal. Food & Agr. Code, Sec. 26661 (underline added).  Regulations enacted under the PPIA permit the labeling nomenclature even when the product is kept at many degrees below 26 degrees Fahrenheit.  California argued that its statute did not create a labeling requirement because it only prohibited the labeling of product as 'fresh' unless it complied with its act.  But the Ninth Circuit quickly rejected the argument because the California statute's language was mandatory and only permitted labeling as fresh under its definition.  Puerto Rico's requirement is not inconsistent with the USDA's regulations, but rather are quite consistent with its definitions.

California also argued that its statute did not create a requirement "in addition to/different than" the PPIA's. The Court turned to the USDA's regulations and

interpretation thereof.  It found that the federal agency permitted the labeling of poultry as "fresh" if it had been stored at temperatures "above 0 degrees and at or below 40 degrees Fahrenheit."  Because some poultry that could be labeled fresh under federal regulations could not be labeled fresh under California's rule, then the requirement was "different than" and therefore pre-empted by express federal statute.  Again, Puerto Rico's requirement is not in addition to, nor different than because they are in alignment, and is strictly an in-state requirement.

Notwithstanding the foregoing, the Ninth Circuit did not go past the PPIA's bright-line pre-emptive bounds.  It found that there were matters covered by California's law that were not subject to the pre-emption statute and severed them from its ruling.  The Court held that "[t]he labeling regulation is functionally severable from the remainder of [Section] 26661…[which] stated purpose…was to 'protect consumers from misleading claims that previously frozen poultry is 'fresh'."  *National Broiler Council*, 44 F. 3d at 748.  Such "legislative purpose will continue to be served…even though the labeling restriction is no longer enforced."  *Id*., at 748-49.   Judge O'Scannlain's concurrence is insightful.  He noticed that although "Congress has given a federal bureaucrat the power to order that frozen chickens be labeled 'fresh'," and that "the California legislature is federally preempted from requiring that frozen chickens be labeled 'frozen'," "States are not without devices of their own to protect their citizens when Congress permits the federal bureaucracy to impose the absurd.  California stores can still be required by state law to tell the truth in advertising and to display frozen chickens for what they are – 'frozen' – even though the labels on the chickens themselves are required by federal law to say 'fresh'."  *Id*., at 749. The court will note from the stipulation that the poultry at

issue indeed was received in the NWS facilities, and the part that was not permitted was distribution and sale of the produce in Puerto Rico with a label one or the other. Alternatively, the Court could sever the "importation" requirement from the local "marketing" requirement.

B.       *Abstention under Burford and/or Younger is appropriate in this case*.

This Court has noticed that "[u]nder our federalist system, 'the balance of power between federal and state courts is delicate, and federal courts must tread with care whenever they are asked to intervene in pending state actions'." *Arana-Santiago v. UPR*, 2019 U.S. Dist. LEXIS 206501, *9 (D. P.R. 2019). Abstention is one of those ways the federal courts tread with care when interference in on-going state procedures is a potential outcome. As stipulated, an administrative action is currently underway before the Department of Agriculture, initiated by NWS, in which it has raised identical claims as it has here, that provides it with due process and protects rights and claims, guarantees fairness, impartiality and remedies against an adverse decision. But if the Court rules on the pre-emption and other claims that NWS has made in this case, it will interfere with the state processes which NWS selected to commence and utilize. Abstention is thusly warranted.

1.       *The Court should abstain from granting redress to NWS under Burford because such order would interfere with state administrative schemes where adequate state judicial remedies exist.*

The *Burford* abstention doctrine requires that "federal courts [ ] abstain in favor of state processes where federal litigation would interfere with a state administrative scheme and where adequate state judicial review exists. *See Sevingy v. Employers Ins. Of Wasau*, 411 F. 3d 24, 26 (1ˢᵗ Cir. 2005), citing *Burford v. Sun Oil Co*., 319 U.S. 315 (1943).

Under the *Burford* doctrine, state administrative procedures do not merely postpone federal court jurisdiction, rather they completely displace federal court review. Edwin Chemerinsky, <u>Federal Jurisdiction</u>, (3d ed. 1999) § 12.2 at p. 755. The First Circuit has explained that "the fundamental concern in *Burford* is to prevent federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution." *Sevingy v. Employers Ins. Of Wasau*, 411 F. 3d at page 27, (citing *Pub. Serv. Co., of N.H. v. Patch*, 167 F. 3d 15, 24 (1st Cir. 1998). Subsequent First Circuit decisions regarding *Burford* abstention have also emphasized whether federal review would involve a detail factual analysis of the bases of the state agency regulatory decision-making or whether federal court review would involve an analysis of the face of the statute, without inquiring beyond the statue and the implementation procedures themselves. *See* for example, *Trailer Marine Transportation v. Rivera-Vázquez*, 931 F. 3d 961, 963-964. (1st Cir. 1991) and *Sevingy v. Employer's Insurance of Wausau*, <u>supra</u>. "*Burford's* concern is interference with the state regulatory process." *Sevingy v. Employers Ins. Of Wasau* 411 F.3d at 28-29. The fundamental concern in *Burford* is to prevent federal courts from by-passing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution. *Public Service Company of New Hampshire, et al, v. Douglas Patch*, 167 F. 15, 25 (1st Cir. 1998).

In this case, PRDA issued notices of violations and orders to show cause why NWS should not be fined for violations to Regulation 8764, Article XII. Notwithstanding denial of NWS' motion showing cause, it sought, by commencing administrative processes, remedies within the PRDA by challenging the orders that denied its motion

showing cause. Dkt. #14-1, para. 20; Exhibit 1. The PRDA's administrative adjudicative process is characterized by affording adequate remedies within the Puerto Rico legal framework. A regulation controls the adjudicative procedures within the PRDA (Regulation 3784), and Puerto Rico's Uniform Administrative Procedures Act provides remedies against decisions which arise thereunder including, reconsideration, judicial review by the Puerto Rico Court of Appeals, and even review to the Supreme Court. P.R. Laws Ann. Tit. 3, secs. 9671, *et seq.* Of note is that NWS has challenged the orders within the administrative forum with the same arguments set forth in the complaint. Dkt. #14-1 paras. 14-23. Thus, the exact remedy that NWS seeks here, it sought within the state statutory scheme before.

2.  *The Court should abstain from granting redress to NWS in federal court under Younger because equity and comity are best served by allowing previously instituted state judicial claims to run their course.*

Similarly, *Younger* abstention requires federal courts to abstain in on-going state cases based on equity and comity principles. *Ohio Civil Rights Comm'n. v. Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986). Under *Younger,* abstention is appropriate when (1) an ongoing state judicial proceeding, instituted prior to the federal proceeding (or, at least, instituted prior to any substantial progress in the federal proceeding), that (2) implicates an important state interest, and (3) provides an adequate opportunity for the plaintiff to raise the claims advanced in his federal lawsuit. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n.* 457 U.S. 423, 432 (1982).

Again, NWS commenced an administrative proceeding well before the institution of this federal proceeding, that has progressed past an initial scheduling conference which affords discovery of evidence, an evidentiary hearing, and a decision on the merits,

subject to reconsideration and judicial review[14]. Dkt. #14-1 paras. 14-23; Exhibits 1-4. The administrative process clearly provides NWS the opportunity to raise the claims it now advances in this federal case. NWS, in its administrative proceeding, challenges and seeks the nullification of all of the Orders. The same remedy is sought in federal court under the guise of pre-emption, commerce clause and local law matters[15].

## III.
## CONCLUSION

Puerto Rico's requirement to have present a PRDA inspector at the opening of a cargo container in which fresh and/or frozen poultry is shipped from the mainland United States to the island of Puerto Rico before the cargo is unloaded from such cargo container into the Plaintiff's official establishment is not pre-empted expressly or implicitly by the PPIA's pre-emption statute. Puerto Rico's regulatory requirement is simply outside of the scope of the federal statute and, as such, permissible. Also outside of the scope of the federal statute is Puerto Rico's requirement to label for marketing purposes, within Puerto Rico, either fresh or frozen because such is not "in addition to" nor "different than" the PPIA, and it is a matter that applies solely to local sales, and not to interstate shipments of poultry.

Alternatively, the Court's intervention at this stage of the process will only serve as an incurable disruption to an on-going state administrative processes that NWS chose to commence. In the administrative forum, NWS raised exactly the same claims it has

---

[14] *See Casiano-Montanez v. State Ins. Fund Corp.*, 852 F. Supp. 2d 177, 187-188 (D. P.R. 2012) ("…if the Board's decision is not favorable to Plaintiffs, they may file requests for judicial review before the Puerto Rico Court of Appeals. The fact that Plaintiffs have access to state judicial review would make federal intervention unnecessary at this juncture. Therefore, state judicial review is sufficient to protect Plaintiffs' constitutional rights.")

[15] Exhibit 1, p. 11-12.

raised in this case first, for which the administrative forum has scheduled a full process, including discovery, motion practice, presentation of evidence, adjudication on the record, and post-decision remedies that include judicial review. This federal case is an afterthought. To permit NWS to seek federal court intervention under such circumstances would violate comity and equity principles under *Burford* and *Younger* abstentions, both of which are clearly applicable here.

**WHEREFORE**, Official Capacity Defendants move this Court to deny NWS's Motion for Injunctive Relief.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 8th day of April, 2022.

**I HEREBY CERTIFY** that of this date a true and exact copy of this motion has also been electronically filed with the Clerk of the District Court using the CM/ECF system which will send notification of such filing to all attorneys of record registered in the use of the CM/ECF system.

*Attorney for Official Capacity Defendants*
**THE LAW OFFICES OF**
**EDWARD W. HILL**
273 Sierra Morena P.M.B 248
San Juan, P.R. 00926
Tel.:    (787) 294-0044


By:    s/ Edward W. Hill
Edward W. Hill
USDC-PR No. 213614